Sophia G. Gold (SBN 307971)
*sgold@kalielgold.com*
**KALIELGOLD PLLC**
490 43rd Street, No. 122
Oakland, California 94609
Telephone: (202) 350-4783

Carl L. Stine (*pro hac vice* application to be filed)
Samuel Coffin (*pro hac vice* application to be filed)
**WOLF POPPER LLP**
570 Lexington Ave.
New York, NY 10022
Telephone: (212) 759-4600
Email: cstine@wolfpopper.com
scoffin@wolfpopper.com

*Attorneys for Plaintiffs and the Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

NATHANIEL TALBOT, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

THE LAGUNITAS BREWING COMPANY,

Defendant.

Case No.

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Nathaniel Talbot ("Plaintiff" or "Plaintiff Talbot"), individually and on behalf of all others similarly situated, brings this action against The Lagunitas Brewing Company ("Defendant Lagunitas," "Defendant," or "the Company"), and alleges on information and belief, except as to the allegations that pertain to Plaintiff, which are based on personal knowledge, as follows:

## INTRODUCTION

1. Plaintiff brings this consumer class action lawsuit on behalf of similarly situated consumers ("Class Members") who purchased for personal, family, or household use, Defendant Lagunitas' beer products (the "Beer"), while Defendant failed to disclose the fact that, as shown by testing conducted by Plaintiff and other parties, the Beer contains per- and polyfluoralkyl substances ("PFAS"), at levels that the Environmental Protection Agency ("EPA") has found pose a risk to human health.

2. PFAS are a group of synthetic, man-made, chemicals known to be harmful to both humans and the environment. Because PFAS persist and accumulate over time, they are harmful even at very low levels. Indeed, PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxicity effects, and various cancers in epidemiology studies. Consequently, the EPA has outlined a host of health effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease.

3. Currently, there is no way to remove PFAS from the body. The only way for consumers to prevent the continued accumulation of these dangerous chemicals in their bodies is to avoid exposure to products that contain PFAS, particularly in their diet.

4. As detailed below, the EPA and state regulators have issued guidelines and enforceable limits regarding the levels of PFAS in drinking water that pose health risks.

5. Plaintiff's independent testing conducted in April and July 2026 found that pursuant to the EPA's reporting method of running annual averages, Lagunitas Beer contained 694 percent of the EPA's enforceable limit for PFOA and 395 percent of the EPA's current enforceable limit for PFNA, while another widely sold beer contained no PFAS.

6. Plaintiff's testing was likely not the first finding that Lagunitas contained levels of PFAS that the EPA has found to pose a risk to human health, and accordingly the Company was or should have been aware of the presence of PFAS in its Beer. A high-profile study conducted by independent researchers in April 2025 found that an undisclosed beer brewed in Sonoma County, California, in which Lagunitas is the largest and only national brewery, contained levels of PFAS that the EPA has found pose risks to human health. Despite the broad dissemination of this study's findings in the brewing industry's trade press that should have put Defendant on notice that its Beer contained PFAS, Defendant failed to take adequate remedial action or disclose the truth to consumers.

7. Instead, at all relevant times and continuing to the present, Defendant brewed, packaged, marketed, and sold the Beer, in a uniform way that fails to disclose the fact that it contains levels of PFAS that the EPA has found pose health risks, which only Defendant could and did know.

8. Plaintiff and Class Members could not have known of these harmful levels of PFAS when they purchased the Beer over Defendant's competitors, to the benefit of Defendant. Like other reasonable consumers, Plaintiff would not have purchased the Beer if Defendant disclosed the fact that it contained levels of PFAS that the EPA has found pose risks to human health, and would have instead purchased a non-contaminated beer from one of Defendant's competitors.

9. Defendant's conduct as alleged herein violates the California Consumer Legal Remedies Act ("CLRA"), the unlawful, unfair, and fraudulent prongs of the California Unfair Competition Law ("UCL"), the California Song-Beverly Act and has resulted in Defendant's unjust enrichment.

**PARTIES**

10. Plaintiff, Nathaniel Talbot, is a natural person and a resident of San Francisco, California.

11. Defendant Lagunitas is major brewing company that is headquartered and brews the entirety of its beer at 280 North McDowell Boulevard, Petaluma, California 94954. In 2015,

Heineken N.V. ("Heineken"), a Dutch multinational beverage holdings company, acquired a 50% stake in Lagunitas, and in 2017, it purchased the remaining 50%, rendering Lagunitas a wholly owned subsidiary of Heineken.[1] [2]

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C § 1332, because the proposed class consists of 100 or more potential class members; the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; and minimal diversity exists.

13. This Court has personal jurisdiction over Defendant because Defendant resides in this district, and Plaintiff's claims arise out of Defendant's business within the forum.

14. Venue properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district, and Defendant is subject to the Court's personal jurisdiction.

## DIVISIONAL ASSIGNMENT

15. Pursuant to Northern District of California Civil Local Rules 3-2(c), 3-2(d), and 3-5(b), assignment to the San Francisco Division of this district is proper because Plaintiff Talbot's residence and the places where he purchased Defendant's Beer are all in San Francisco County, California, and Defendant resides in Sonoma County, California.

## FACTUAL ALLEGATIONS

### A. The Lagunitas Brewing Company

16. The Lagunitas Brewing Company was founded in 1993 by Tony Magee in Lagunitas, California. Shortly after its founding, in 1995, it moved its operations to nearby Petaluma, California in Sonoma County, where it continues to operate and brew all its Beer.

---

[1] John Kell, "Heineken buys 50% stake in craft brewer Lagunitas," *Fortune*, September 10, 2015.
[2] Mobley, Esther, "Heineken deal could raise Lagunitas' global profile." *San Francisco Chronicle*, May 5, 2017.

17. Between 2012 and 2014, the Company grew by 58% year-over-year. In 2014, Lagunitas sold 599,000 barrels of Beer, with the Lagunitas IPA, an India Pale Ale, and Lagunitas' Little Sumpin' Sumpin', a wheat ale, as its main products.[3]

18. On September 8, 2015, the Dutch beverage holdings company Heineken N.V. announced that it had purchased a 50% stake in Lagunitas. Heineken also announced plans to sell Lagunitas Beer internationally, which would turn Lagunitas into the first global craft beer company.

19. At the time of the acquisition, Lagunitas was expected to sell more than 800,000 barrels for the coming year. While the terms of the transaction were not disclosed, because recent craft brewery acquisitions had priced companies at a price of more than $1,000 per barrel, analysts estimated that Lagunitas' valuation was at least over $800 million, while some reported that it was over $1 billion.

20. Because the 2015 acquisition gave Heineken a 50% stake in the Company's ownership, Lagunitas officially lost its status as a "craft brewery" under the definition set forth by the Brewers Association, which requires that no more than 25% of craft brewery can be owned by a "beverage alcohol industry member that is not itself a craft brewer[,]" such as Heineken.[4]

21. After the 2015 acquisition, Heineken expanded the distribution of Lagunitas into international markets, including in France, Italy, Mexico, Spain, the UK, Canada, the Netherlands, Sweden and Japan.[5]

22. The Company's operations also grew domestically after the 2015 acquisition. Court filings by Lagunitas before the United States Patent and Trademark Office disclosed that Nielsen

---

[3] Mickle, Tripp, "Heineken Buys 50% Stake in Lagunitas Brewing." *Wall Street Journal*, September 8, 2015. https://www.wsj.com/articles/heineken-buys-50-stake-in-lagunitas-brewing-1441744398 (last accessed Aug. 4, 2026).

[4] https://www.brewersassociation.org/statistics-and-data/craft-brewer-definition/ (last accessed Aug. 4, 2026).

[5] Mobley, Esther, "Heineken deal could raise Lagunitas' global profile." *SF Gate*, May 4, 2017. https://web.archive.org/web/20170504205719/http://www.sfgate.com/business/article/Heineken-buys-rest-of-Lagunitas-as-beer-sales-go-11121674.php (last accessed Aug. 4, 2026).

market research found the IPA was top selling IPA beer in the United States every year from 2017-20, and the Sumpin' Sumpin' Ale was in the top 10 IPA beers for the same period.[6]

23. On May 4, 2017, Heineken announced that it would purchase the remaining 50% of Lagunitas for an undisclosed price, which turned the Company into a wholly owned subsidiary. At the time of the 2017 transaction, it was reported that Lagunitas produced about 1.1 million barrels of Beer per year.[7]

24. Since August 2024, all Lagunitas Beer has been produced at the brewery in Petaluma, California. Of the 706,000 barrels produced by Lagunitas in 2024, 67% were its two largest beers: the IPA and Little Sumpin' Sumpin.

25. Upon information and belief, Lagunitas is the largest brewery located in Sonoma County, California, and the only brewery in Sonoma County that distributes its beer nationally and internationally.

**B. PFAS in Lagunitas Beer**

**1. The Health Risks of PFAS in Consumer Products**

26. PFAS are a category of highly persistent and harmful man-made chemicals, which include perfluorooctanoic acid ("PFOA"); perfluorooctanesulfonic acid ("PFOS"); perfluorononanoic acid ("PFNA"); and perfluorohexanesulfonic acid ("PFHxS").[8]

27. PFOS in particular is well-known to have severe and negative impacts on human health and the environment. Given the adverse effects of PFOS on the body and environment, it is one of the most commonly studied and regulated types of PFAS.[9]

---

[6] Mickle, Tripp, "Heineken Buys 50% Stake in Lagunitas Brewing." *Wall Street Journal*, September 8, 2015. https://www.wsj.com/articles/heineken-buys-50-stake-in-lagunitas-brewing-1441744398 (last accessed Aug. 4, 2026).

[7] Mobley, Esther, "Heineken deal could raise Lagunitas' global profile." *SF Gate*, May 4, 2017. https://web.archive.org/web/20170504205719/http://www.sfgate.com/business/article/Heineken-buys-rest-of-Lagunitas-as-beer-sales-go-11121674.php (last accessed Aug. 4, 2026).

[8] https://www.epa.gov/pfas/pfas-explained (last accessed Aug. 4, 2026).

[9] *See* https://www.atsdr.cdc.gov/pfas/health-effects/overview.html (last accessed Aug. 4, 2026).

28. PFAS are a source of consumer concern, due to various widespread environmental presence, bio-accumulative properties, extreme persistence, and strong evidence of myriad adverse health effects.[10]

29. As a result, there has been an international effort in the scientific, regulatory, and industrial communities to cease the production and uses of PFAS, including in food and beverage products.[11]

30. Critically, PFOS and PFOA have been phased out of production since the early 2000s and are prohibited from manufacturing and most consumer uses in European Union countries since 2008 (Directive 2006/122/EC).[12]

31. Diet is one of the major sources of human PFAS exposure, and accordingly reasonable consumers purchasing any beverage product would not expect it to contain harmful man-made chemicals, such as PFAS.[13]

32. The Environmental Protection Agency ("EPA") has identified that "[c]urrent peer-reviewed scientific studies have shown that exposure to certain levels of PFAS [which the EPA defines through a number of rules] may lead to:"[14]

a. Reproductive effects such as decreased fertility or increased high blood pressure in pregnant women.

b. Developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes.

---

[10] Raveena Dhore, Ganti S. Murthy, "Per/polyfluoroalkyl substances production, applications and environmental impacts." (Dec. 2021), https://www.sciencedirect.com/science/article/abs/pii/S0960852421011494.

[11] Nicole Marie Brennan, et al., "Trends in the Regulation of Per- and Polyfluoroalkyl Substances (PFAS): A Scoping Review." (Oct. 17, 2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8536021/.

[12] *See* https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=celex%3A32006L0122 (last accessed Aug. 4, 2026).

[13] Herbert P. Susmann, et al., Dietary Habits Relate to Food Packaging and Population Exposure to PFASs, (Oct. 9, 2019), https://ehp.niehs.nih.gov/doi/full/10.1289/EHP4092.

[14] *See* https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (last accessed Aug. 4, 2026).

c. Increased risk of some cancers, including prostate, kidney, and testicular cancers.

d. Reduced ability of the body's immune system to fight infections, including

e. Interference with the body's natural hormones.

f. Increased cholesterol levels and/or risk of obesity.

33. A figure from the European Environmental Agency ("EEA") depicts the "[e]ffects of PFAS on human health:"[15]




34. The EPA has stated that limiting exposure to PFAS, including by reducing the consumption of beverages that contain it, can help protect individual health. "Because certain PFAS are known to cause risks to human health, the most important steps you and your family can take to

[15] *See* https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe (last accessed Aug. 4, 2026).

protect your health is to understand how to limit your exposure to PFAS by taking [steps to] reduce possible exposure during daily activities."[16]

35. There is currently no procedure, treatment, or remedial measure to remove PFAS from the body once it has been consumed, and individual PFAS chemicals have a half-life that is longer than human life expectancy. Because PFAS accumulates in body tissues over time and does not break down organically within a human lifetime, the only way for people to keep PFAS from accumulating within their bodies is to refrain from consuming products that contain it.[17]

**2. Regulators and Consumers are Focused on PFAS in Consumer Products**

36. The EPA and state regulators have found that PFAS exposure has negative effects on the immune system, the cardiovascular system, the reproductive system, and increases the risk of cancer, and adopted policies accordingly.

37. Indeed, the EPA recently finalized health-based, non-enforceable Maximum Contaminant Level Goals (MCLGs) for drinking water, which are defined as the "level of a contaminant in drinking water below which there is no known or expected risk to health."[18]

38. The EPA set the MCLG for both PFOA and PFOS at 0 parts per trillion (ppt), meaning that according to the EPA, any amount of PFOA or PFOS in drinking water is known to pose a risk to human health.[19]

39. For other categories of PFAS, exposure to even trace amounts can pose substantial risk to health. For instance, the EPA's recent MCLG's were set for 10 ppt for PFNA.[20]

40. The same rules promulgated by the EPA also established legally enforceable levels, called Maximum Contaminant Levels (MCLs) for drinking water which are defined as the "highest

---

[16] *See* https://www.epa.gov/pfas/meaningful-and-achievable-steps-you-can-take-reduce-your-risk (last accessed Aug. 4, 2026).

[17] Nancy Schimelpfening, "How to Reduce your Exposure to PFAS: the Hidden Toxic 'forever Chemicals.'" (Oct. 13, 2021), https://www.healthline.com/health-news/how-to-reduce-yourexposure-to-pfas-the-hidden-toxic-forever-chemicals#How-to-limit-PFAS-exposure.

[18] https://www.epa.gov/system/files/documents/2024-04/pfas-npdwr_fact-sheet_general_4.9.24v1.pdf (last accessed Oct. 27, 2026).

[19] *See* https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas (last accessed Aug. 4, 2026).

[20] *Id.*

level of a contaminant that is allowed in drinking water[,]" and "are set as close to MCLGs as feasible using the best available treatment technology and taking cost into consideration."[21]

41. The MCL for PFOA is 4 ppt.[22]

42. For PFNA, the MCL is currently 10 ppt, and the new rules propose rescinding the enforceability of the rule for procedural, not substantive reasons: "The EPA's proposal is necessary to correct the unlawful procedure under which regulations for these PFAS were promulgated. The EPA's proposal is solely based on a need to correct this unlawful process. . . . While the EPA cannot pre-determine the outcome, it is possible that the result could be more stringent requirements."[23]

43. In addition to the EPA, the states of Illinois, Maine, Vermont, and Oregon have on a state level codified the EPA's current MCLs for drinking water of 4 ppt for PFOA and 10 ppt for PFNA. Michigan has adopted an MCL of 8 ppt of PFOA and 6 ppt for PFNA. Massachusetts has adopted an enforceable standard for various PFAS including PFOA and PFNA that limits total amounts to 20 ppt in total across separate PFAS chemicals.

44. Other regulatory bodies have pursued other strategies to mitigate the recognized risk of consumer exposure to PFAS aside from enforceable standards, including through disclosure or mandatory regulatory reporting. For instance, the California Office of Environmental Health Hazard Assessment (OEHHA) requires disclosure of any amount of both PFNA and PFOA.[24]

45. In 2021, Maine also implemented a statutory scheme that required manufacturers to notify the state's Department of Environmental Protection ("Maine DEP") for products that it knew contained PFAS on staggered timelines. 38 M.R.S. § 1614.

46. On August 14, 2023, the Maine DEP released a "[l]ist of manufacturers with an approved extension of the January 1, 2023, PFAS in products reporting deadline set forth in 38

---

21 https://www.epa.gov/system/files/documents/2024-04/pfas-npdwr_fact-sheet_general_4.9.24v1.pdf (last accessed Oct. 27, 2026).

22 https://www.epa.gov/sdwa/proposed-pfas-rescission-rule (last accessed Oct. 21, 2026).

23 *Id.*

24 https://oehha.ca.gov/proposition-65/proposition-65-list (last accessed Oct. 21, 2026).

M.R.S. §1614(2)(A), as currently in affect." The Lagunitas Brewing Company was one of the manufacturers that had sought an extension from the reporting deadline.[25]

47. In addition to federal and state regulatory bodies, the public is increasingly aware of the severe health risks posed by chemicals in consumer products in general and PFAS specifically. For instance, a study conducted by Pew Research Center released on February 26, 2026, titled "Americans Are Concerned About Harmful Chemicals in Food, Water and Everyday Products" found that "[m]ore than 70% of adults in the United States are very or somewhat concerned about their own or their loved ones' exposure to harmful chemicals in food and drinking water." The same study found that "5 in 6 want government and business to do more to ensure chemical safety and increase transparency around the use of chemicals."[26]

48. Another study released in Plos One on November 16, 2023, titled "Let's talk about PFAS: Inconsistent public awareness about PFAS and its sources in the United States" found that 34.8% of subjects reported "being very or extremely concerned about PFAS in their drinking water," while another 18.9% "had already changed their drinking-water use."[27]

**3. The April 2025 Study of PFAS in Beer**

49. On April 24, 2025, a study (the "April 2025 Study") titled "Hold My Beer: The Linkage between Municipal Water and Brewing Location on PFAS in Popular Beverages" was published by scientists affiliated with the research firm RTI International in the peer-reviewed scientific journal sponsored by the American Chemical Society, "Environmental Science & Technology."[28]

---

[25] https://www.maine.gov/dep/spills/topics/pfas/PFAS-products/Approved-manufacturers.pdf (last accessed Oct. 21, 2026).

[26] Americans Are Concerned About Harmful Chemicals in Food, Water and Everyday Products | The Pew Charitable Trusts (last accessed Oct. 21, 2026).

[27] T. Allen Berthold, Audrey McCrary, Stephanie deVilleneuve, Michael Schramm, "Let's talk about PFAS: Inconsistent public awareness about PFAS and its sources in the United States." PLOS ONE, Nov. 2023 https://journals.plos.org/plosone/article?id=10.1371%2Fjournal.pone.0294134& (last accessed Oct. 21, 2026).

[28] Hoponick Redmon J., De Luca N. M., Thorp E., Liyanapatirana C., Allen L., Kondash A. J. "Hold My Beer: The Linkage between Municipal Water and Brewing Location on PFAS in Popular

50. The April 2025 Study applied Method 533, a generally accepted laboratory test procedure used to measure PFAS in drinking water, to test 23 beers for 17 targeted PFAS, and was the first study "to adapt EPA Method 533 to measure PFAS in beer from various regions, brewery types, and water sources."[29]

51. The April 2025 Study selected the 23 beers based on four criteria, and each beer was selected based on one of four criteria. Criteria 1 and 2 beers were selected because they were brewed in regions with PFAS in municipal drinking water and thus were targeted for the study to understand if there was an association between PFAS in tap water and beer. Criteria 3 and 4 beers were selected because they were popular beers domestically and internationally, respectively.

52. The April 2025 Study designated the selected beers anonymously by county and state in which each product was brewed and did not disclose which beers had been sampled.

53. In accordance with standard reporting procedures, the April 2025 Study reported both a method detection limit ("MDL") and a method reporting limit ("MRL").

54. The MDL is the lowest concentration of a substance that can be measured and reported with 99% confidence that the concentration is greater than zero. The MRL is a higher, practical limit where the laboratory can accurately and quantitatively measure the chemical in a real sample.

55. Of the Criteria 1 and 2 beers, which were all brewed in North Carolina, Michigan and California in areas that had high levels of PFAS in public water sources, 12 of the 15 sampled beers had PFAS above the MRL.

56. Of the Criteria 3 and 4 beers, which were popular domestic and international products, one of the five popular national beers and one of three international beers contained detectable PFAS above the MRL.

---

Beverages." ENVIRON. SCI. TECHNOL. 2025;59(17):8368–8379. https://pubs.acs.org/esthag/article-pdf/59/17/8368/40979249/es4c11265.pdf (last accessed Aug 4, 2026).

[29] *Id.*

57. In particular, Beer 4 for Criteria 2 was brewed in Sonoma County, California, where Lagunitas is the largest brewery and the only one that distributes its Beer nationally and internationally.

58. The April 2025 Study consisted of five replicate PFAS measurements, which were each reported and then averaged. Throughout the five replicates, Beer 4 for Criteria 2 was found to contain between 2.638 and 6.523 ppt of PFOA, with a mean through the phases of the study of 3.187 ppt of PFOA.

59. All replicates found that Beer 4 for Criteria 2 exceeded the MCLG for PFOA, which is 0 ppt. One replicate found that it exceeded the MCL, which is 4 ppt, and on average the replicates found that it was just below the EPA's legal limit for PFAS in drinking water.

60. Throughout the five replicates, Beer 4 for Criteria 2 was also found to contain between 0.633 and 0.816 ppt of PFOS.

61. The findings of the April 2025 Study were widely disseminated within the scientific community and the brewing industry. On May 21, 2025, the American Chemical Society released a statement announcing the findings, and called on "greater awareness among brewers, consumers and regulators to limit overall PFAS exposure."[30]

62. The April 2025 Study was also the subject of commentary within the brewing industry. For instance, on May 13, 2025, the Brewers Association reviewed the study and issued a commentary on its website complete with recommendations for how breweries could minimize PFAS in their beer, stating that: "Common filtration methods used in breweries can, when systems are well maintained, help minimize PFAS contamination. Reverse osmosis and activated carbon filtration have been shown to be somewhat effective in removing longer-chain PFAS compounds."[31]

63. Months later, on September 4, 2025, Food & Wine released an article titled, "Your Beer May Contain 'Forever Chemicals,' According to New Research." The article restated the

---

[30] https://www.acs.org/pressroom/presspacs/2025/may/research-reveals-forever-chemicals-present-in-beer.html (last accessed Aug. 6, 2026).

[31] https://www.brewersassociation.org/association-news/pfas-compounds-found-in-beer/ (last accessed Aug. 6, 2026).

study's findings and mentioned that beers from California were tested and found to have material levels, and that "beer brewers could take responsibility for identifying and removing those sources to reduce the problem."[32]

**4. Plaintiff's Testing of Lagunitas Beer**

64. After the release of the April 2025 Study, Plaintiff became concerned that the anonymous Beer 4 for Criteria 2, brewed in Sonoma County, California, was Lagunitas, and arranged for a qualified laboratory to test Lagunitas Beer in April 2026.

65. The qualified laboratory, based in Bend, Oregon, conducted testing on Lagunitas IPA pursuant to generally accepted methods that adapted EPA method 533, which is used to test water sources for PFAS, to test the Beer.

66. Under method 533, the EPA reports that "Compliance with MCLs is determined by running annual averages at the sampling point."[33] Accordingly, to determine whether a water system is in compliance with its MCLs, the EPA calculates the average findings of its various samples to be reported as the level of a given chemical for that water system.

67. Plaintiff's testing included four samples of Lagunitas Beer, which were purchased from retail stores across the United States, and one sample of Modelo Especial.

68. All of Plaintiff's samples were purchased immediately before testing from retail stores. The shelf life of beer in retail stores is widely understood to be "up to 2-3 months" for IPAs, and accordingly, all samples were likely brewed between January and March 2026.[34]

69. The first sample, tested in April 2026, was of a tallboy can of Lagunitas IPA purchased in Eugene, Oregon. The first sample contained 100 ppt of PFNA, ***1,000 percent*** of the current limit established by EPA.

70. The second sample, tested in June 2026, was of a tallboy can of Lagunitas IPA purchased in Green Bay, Wisconsin. The second sample contained 67 ppt of PFOA, more than

---

[32] https://www.foodandwine.com/beer-pfas-forever-chemicals-11801557 (last accessed Aug. 6, 2026).
[33] https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas (last accessed October 27, 2026).
[34] https://www.foodandwine.com/how-long-beer-good-11924722 (last accessed, Oct. 27, 2026).

***1,160 percent*** of the limit established by the EPA. It also contained 58 ppt of PFNA, which is almost ***600 percent*** of the current limit established by the EPA.

71. The third sample, tested in June 2026, was of a bottle of Lagunitas IPA purchased in Green Bay, Wisconsin. The third sample contained 44 ppt of PFOA, ***1,100 percent*** the limit established by the EPA.

72. Pursuant to the methodology of reporting adopted by the EPA in method 533, Plaintiff's testing found a running annual average of 27.75 ppt of PFOA, which is ***694 percent*** of the limit established by the EPA.

73. Plaintiff's PFOA test results are at levels drastically above the MCLs of Maine, Vermont, Oregon, Massachusetts, New Jersey, Illinois and Michigan.

74. Plaintiff's testing found a running annual average of 39.5 ppt of PFNA, which is ***395 percent*** of the current limit established by the EPA.

75. Plaintiff's PFNA test results are at levels drastically above the MCLs of Maine, Vermont, Oregon, Massachusetts, New Jersey, Illinois and Michigan.

76. Plaintiff also tested one sample of Modelo Especial as a control subject to compare with Lagunitas in September 2026. Unlike the samples of Lagunitas, the Modelo Especial ***did not contain any*** PFAS chemicals that the EPA has found to pose a risk to human health.

**C. Plaintiff's Experience with Lagunitas**

77. Plaintiff is a citizen and resident of the state of California. During the applicable statute of limitations period, Plaintiff purchased and consumed Lagunitas Beer that contained PFAS on a regular basis. More specifically, during the class period, Plaintiff, a food and beverage enthusiast and social beer drinker, purchased the Beer on a regular basis at local grocery stores and a 7-Eleven in San Francisco, California.

78. Prior to each of his routine purchases, Plaintiff reasonably believed that the Beer did not pose risks to human consumption if the consumer abided by responsible drinking practices, and like the Modelo Especial product tested, was free of harmful, man-made chemicals like PFAS.

79. He would not have purchased the Beer over its non-contaminated competitors, on the terms he did or any other, if the true facts regarding the health risks it posed due to the presence of PFAS, which Defendant had actual knowledge of but failed to disclose to him.

80. As a direct result of Defendant's conduct as alleged herein, Plaintiff suffered and continues to suffer, economic injuries because he routinely purchased a Beer that contained levels of PFAS that the EPA has found present risks to human health, which he would not have otherwise purchased.

81. Plaintiff, a lifelong resident of Northern California, has an affection and fondness for Lagunitas Beer as an iconic regional brand associated with positive local memories. He continues to desire to purchase it from Defendant if he can rely on that Beer to be free from PFAS, which are known to pose risks to human health.

82. However, concerned about the health risks of PFAS in Defendant's Beer as detailed herein, Plaintiff is unable to determine if Defendant's Beer is actually free of harmful chemicals like PFAS in the future. Plaintiff understands that the composition of the Product may change over time, but as long as Defendant may impliedly warranties that the Beer does not contain levels of PFAS found by the EPA to pose risks to human health when it actually does, he will be unable to make informed decisions about whether to purchase Defendant's Beer.

## CLASS ACTION ALLEGATIONS

83. Plaintiff Talbot brings this suit as a class action on behalf of himself and all others similarly situated pursuant to Fed. R. Civ. P. 23. This action may be properly maintained as a class action, as it satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Fed. R. Civ. P. 23.

84. Plaintiff Talbot seeks to represent a class of all persons in the United States who purchased Lagunitas Beer, which unbeknownst to them contained levels of PFAS that the EPA has found pose a risk to human health (the "Class").

85. Upon completion of discovery with respect to scope of the Class, Plaintiff Talbot reserves the right to amend the class definition. Excluded from the Class are Defendant, its direct parents, subsidiaries and affiliates, and their directors and officers.

86. While the exact number of members cannot be determined, the Class consists of, at a minimum, thousands of persons. The members of the Class are therefore so numerous that joinder of all members is impracticable. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.

87. There are common questions of law and fact that exist as to all members of the Class and predominate over any questions affecting only individual members, including but not limited to:

a. whether Defendant omitted, or failed to adequately disclose that their Beer contained levels of PFAS that the EPA has found pose a risk to human health;

b. whether Defendant failed to adequately implement measures to produce, distribute and sell their Beer in such a way that complied with all warranties to consumers;

c. whether Defendant's conduct violated the laws cited in the causes of action herein;

d. whether Defendant was unjustly enriched by its conduct as alleged herein;

e. whether Defendant's conduct damaged members of the Class and, if so, the measure of those damages; and

f. whether all members of the Class are entitled to seek equitable and/or injunctive relief from Defendant, and if so, the measure and form of such relief.

88. Plaintiff's claims are typical of the claims of the Class because Plaintiff and all Class Members have sustained damages arising out of Lagunitas' common course of conduct as alleged herein.

89. Plaintiff will fairly and adequately represent and protect the interests of the other Class members for purposes of Federal Rule of Civil Procedure 23(a)(4). Plaintiff is committed to pursuing this action and has retained competent counsel experienced in litigation of this type, and class action litigation in particular. Plaintiff has no interests antagonistic to those of other Class Members.

90. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the respective Class members to seek redress for the wrongful conduct alleged. Plaintiff's counsel, highly experienced in class action litigation, foresees little difficulty in the management of this case a class action.

## CAUSES OF ACTION

### COUNT I
**Violation of the California Consumer Legal Remedies Act ("CLRA")**
**Cal. Civ. Code §§ 1750, et seq.**
***(On Behalf of Plaintiff and the Class)***

91. Plaintiff hereby incorporates by reference all allegations made in the previous paragraphs.

92. The California CLRA prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale . . . of services to any consumer," which include: "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have …." (§ 1770(a)(5)); and/or "Advertising goods or services with intent not to sell them as advertised" (§ 1770(a)(9)).

93. Plaintiff and Class Members are "consumers" as defined by Civil Code § 1761(d).

94. Defendant is a "person" as defined by Civil Code § 1761I.

95. The Beer qualifies as a "good" as defined by Civil Code § 1761(a).

96. Plaintiff and Class Members' purchases of the Beer are "transactions" as defined by Civil Code § 1761(e).

97. Defendant's conduct alleged herein violates Cal. Civ. Code § 1770(a)(5) in that Defendant failed to disclose and thereby implied that the Beer did not contain levels of PFAS that the EPA has found pose a risk to human health.

98. Defendant had actual knowledge that its Beer contained levels of PFAS that the EPA has found pose a risk to human health because (1) the Company sought an extension to reporting requirements established by the Maine DEP, and (2) should have known that its Beer was likely the subject of the April 2025 Study but failed to disclose this information to Plaintiff and Class Members.

99. Upon recognizing that (1) the Company would need to report to the Maine DEP if the Beer contained PFAS, and (2) a widely disseminated study identified a Sonoma County beer, the county in which Lagunitas is the largest and only national brewery, as a subject that contained PFAS, it is implausible that Defendant did not conduct its own testing of the Beer. This testing, like Plaintiff's testing, would have demonstrated that the Beer contained levels of PFAS that the EPA has found pose a risk to human health.

100. As detailed above, Defendant further violated the CLRA when it falsely conveyed and implied that the Beer meets a certain quality that reasonable consumers would expect based on the EPA's established standards.

101. Specifically, Defendant marketed the Beer while failing to disclose that the Product contained levels of PFAS found by the EPA to pose a risk to health, which no reasonable consumer would knowingly buy over competitors that do not pose such a risk.

102. Defendant's deceptive practice of failing to disclose these material facts regarding the levels of PFAS in the Beer was designed to induce Plaintiff and Class Members to purchase or otherwise acquire the Beer instead of beers produced by Defendant's competitors.

103. Plaintiff and the other members of the Class have been, and continue to be, injured as a direct and proximate result of Defendant's violations of Cal. Civ. Code § 1770, and are entitled to seek recovery, as well as to pursue costs and attorneys' fees under § 1780(e).

104. Under the requirements of Cal. Civ. Code 1782, Plaintiff Talbot will send a CLRA letter to Defendant. If Defendant fails to rectify these issues within the time period specified therein, Plaintiff will assert claims for additional relief, including damages and punitive damages pursuant to Cal. Civ. Code § 3294.

**COUNT II**

**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, et seq.**
***(On Behalf of Plaintiff and the Class)***

105. Plaintiff hereby incorporates by reference all allegations made in the previous paragraphs.

106. Plaintiff asserts this cause of action against Defendant for unlawful, unfair, and fraudulent business practices; and unfair, deceptive, untrue and misleading advertising, as defined by the UCL.

107. Defendant's conduct violates the UCL, as the acts and practices of Defendant constitute a common and continuing course of conduct by means of "unlawful," "unfair," and "fraudulent" business acts or practices within the meaning of the UCL.

108. Defendant's conduct was **fraudulent** within the meaning of the UCL insofar as Defendant knowingly failed to disclose the fact that Lagunitas Beer contained PFAS at levels found by the EPA to pose a risk to human health.

109. Defendant's conduct is **unlawful**, and thus amounts to unfair competition as set forth in the UCL, in that it violates, among other things, California Civil Code §§ 1572, 1709 and 1710; California Business & Professions Code § 17500 (the False Advertising Law); and California Business & Professions Code § 1790 (the "Song-Beverly Act").

110. The Song-Beverly Act requires that "Every sale of consumer goods... shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable." Cal. Civ. Code § 1792). It also requires that goods are "Fit for the ordinary purposes for which such goods are used." (Cal. Civ. Code § 1791.1(a)(2)).

111. Defendant conduct is **unfair**, and thus amounts to unfair competition as set forth in the UCL, in that it is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers who purchased Beer that contained levels of PFAS found by the EPA to pose a risk to health that they would not have otherwise purchased; and because it contravenes legislative policy as set forth in, *inter alia*, the Song-Beverly Act. Thousands of consumers like Plaintiff have been purchasing Beer that they had no knowledge contained levels of PFAS found by the EPA to pose a risk to health, which they would not have done had Defendant disclosed the truth.

112. Defendant had actual knowledge that its Beer contained levels of PFAS that the EPA has found pose a risk to human health because (1) the Company sought an extension to reporting requirements established by the Maine DEP, and (2) should have known that its Beer was likely the subject of the April 2025 Study but failed to disclose this information to Plaintiff and Class Members.

113. Upon recognizing that (1) the Company would need to report to the Maine DEP if the Beer contained PFAS, and (2) a widely disseminated study identified a Sonoma County beer, the county in which Lagunitas is the largest and only national brewery, as a subject that contained PFAS, it is implausible that Defendant did not conduct its own testing of the Beer. This testing, like Plaintiff's testing, would have demonstrated that the Beer contained levels of PFAS that the EPA has found pose a risk to human health.

114. Consumers would not have purchased the Beer over its competitors if Defendant had disclosed this fact, and thereby Defendant retained wrongful funds from Plaintiff and members of the Class. Accordingly, Defendant acted with conscious disregard for the rights of Plaintiff and members of the Class.

115. As a direct and proximate cause of Defendant's violations of the UCL, Plaintiff and the Class suffered an injury in fact and have suffered monetary harm. Defendant, on the other hand, has been unjustly enriched and should be required to make restitution to Plaintiff and the Class pursuant to Business & Professions Code § 17203.

116. Significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law. Due to these differences in proof and certainty, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law for damages. Even if legal remedies may be available, Plaintiff seeks equitable remedies in the alternative to legal remedies which are not yet uncertain.

117. A constructive trust should be imposed upon all wrongful or inequitable proceeds received by Defendant traceable to Plaintiff and members of the Class.

**COUNT III**

**Breach of Implied Warranty Under the Song-Beverly Act, Cal. Civ. Code § 1790, et seq. and California Commercial Code § 2314**
***(On Behalf of Plaintiff and the Class)***

118. Plaintiff hereby incorporates by reference all allegations made in the previous paragraphs.

119. Under the Song-Beverly Act every sale of consumer goods in the state of California is accompanied by both a manufacturer's and retail seller's implied warranty that the goods are merchantable, as defined in that Act. In addition, every sale of consumer goods in California is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular purpose and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

120. The Beer is a "consumer good" within the meaning of Cal. Civ. Code § 1791(a).

121. Plaintiff and Class Members who purchased the Product are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

122. Defendant is in the business of manufacturing and/or producing the Beer and therefore is a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

123. Defendant implied that the Beer was merchantable in that it would: (a) pass without objection in the trade or industry under the contract description, and (b) was fit for the ordinary

purposes for which the Beer is used. For a consumer good to be "merchantable" under the Song-Beverly Act, it must satisfy both of these elements. Defendant breached these implied warranties because, unlike other beers manufactured by the Company's competitors, the Beer contained levels of PFAS found by the EPA to pose risks to health. Therefore, the Beer would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which they are used.

124. Plaintiff and Class Members purchased the Beer in reliance upon Defendant's skill and judgment in properly producing, distributing, packaging and labeling the Beer.

125. The Beer was not altered by Plaintiff or Class Members.

126. The Beer was defective at the time of sale because it contained levels of PFAS found by the EPA to pose risks to health. The danger as described in this Complaint was latent in the Beer and not discoverable to consumers at the time of sale.

127. Defendant knew the Beer would be purchased and used without additional testing by Plaintiff and Class Members, and that it was the only party to the transaction that could know that the Beer contained levels of PFAS that the EPA has found present a risk to human health, rendering the Beer defective.

128. As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff and Class Members have been injured and harmed because they would not have purchased the Beer if they knew the truth about the Product, namely, that it contained levels of PFAS found by the EPA to pose risks to health.

129. Concurrent to the filing of this Complaint, Plaintiff's counsel will send Defendant a notice letter apprising Defendant of its breach of warranties. The letter will be sent via certified mail, return receipt requested, advising Defendant that it is in breach of its warranties and demanding that they cease and desist from such violations. The letter will state that it will be sent on behalf of all other similarly situated purchasers.

130. Unless Defendant remedies its breach of warranties as alleged herein, Plaintiff and the Class will seek compensatory damages, attorneys' fees, litigation costs, and any other relief available under the law.

## COUNT IV

**Unjust Enrichment**
***(On Behalf of Plaintiff and the Class)***

131. Plaintiff hereby incorporates by reference all allegations made in the previous paragraphs.

132. Through the conduct alleged herein, Lagunitas received and retained tangible benefits at the expense of Plaintiff and Class members, including by collecting payment for the Beer that they would not have been able to collect had disclosed that the Beer contained levels of PFAS that found by the EPA to pose risks to health.

133. Under the principles of public policy and equity, Defendant should not be permitted to retain the revenue it acquired through its unlawful conduct, *i.e.*, its sale of Beer as alleged herein and failure to disclose of the true nature of that beer to consumers who would not have otherwise purchased it over its competitors. All money, assets, and benefits that Lagunitas has unjustly received because of their actions rightfully belong to the Class.

134. To remedy Defendant's unjust enrichment at the expense of Plaintiff and the Class, the Court should order Defendant to immediately return Plaintiff's and Class Members' payments made as a result of Defendant's illicit conduct, and disgorge any amounts received by Defendant resulting therefrom.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, requests that the Court award the following relief, together or in the alternative:

a. Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23;

b. Appoint Plaintiff's Counsel as representative of the Class, and designate the undersigned as Class Counsel;

c. Declare Defendant's conduct unlawful;

d. Enjoin Defendant from continuing the unlawful conduct alleged herein;

e. Award Plaintiff and the Class damages under common law and/or by statute, including punitive damages;

f. Grant Plaintiff and the Class payment of the costs of prosecuting this action, including expert fees and expenses;

g. Grant Plaintiff and the Class payment of reasonable attorneys' fees; and

h. Grant such other equitable relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff and Class Members demand a trial by jury on all triable issues.

Dated: November 2, 2026

**KALIELGOLD PLLC**

By: */s/ Sophia G. Gold*
Sophia G. Gold

**WOLF POPPER LLP**
Carl L. Stine (*pro hac vice* application to be filed)
Samuel Coffin (*pro hac vice* application to be filed)

*Attorneys for Plaintiff and the Putative Class*